Steven N. Kurtz, Esq. [SBN 125972]
skurtz@laklawyers.com
Anne C. Manalili, Esq. [SBN 193483]
amanalili@laklawyers.com
**LEVINSON ARSHONSKY & KURTZ, LLP**
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Telephone:  (818) 382-3434
Facsimile:   (818) 382-3433

Attorneys for Plaintiff OPENROAD FINANCIAL
SERVICES, INC., an Oregon corporation.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENROAD FINANCIAL SERVICES, INC., an Oregon corporation, <br><br> Plaintiff, <br><br> vs. <br><br> MCKESSON CORPORATION, a Delaware corporation, dba MCKESSON PHARMACEUTICAL, DOES 1 through 25, inclusive, <br><br> Defendants. | CASE NO. <br><br> Assigned to Hon. <br><br> **COMPLAINT FOR:** <br><br> 1. **Breach of Contract** <br> 2. **Services Rendered** <br> 3. **Breach of Statutory Duty to Pay** <br> 4. **Declaratory Relief** <br> 5. **Accounting** |

Plaintiff OpenRoad Financial Services, Inc., an Oregon corporation ("Plaintiff") alleges the following for its Complaint:

## **PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiff is, and at all relevant times hereto was, a corporation organized under the laws of the state of Oregon with its principal place of business located in Dallas, Oregon and is a citizen of the state of Oregon.

2.     Plaintiff is informed and believes, and based thereon alleges, that Defendant McKesson Corporation dba McKesson Pharmaceutical ("Defendant" or "McKesson") is, and at all relevant times hereto was, a corporation organized under the laws of the state of Delaware with its principal place of business located in Irving, Texas and is a citizen of the states of Delaware and

1  Texas. Plaintiff is further informed and believes, and based thereon alleges, that McKesson has

2  offices in, and does business in, San Francisco, California.

3    3.    Plaintiff is unaware of the true names and capacities of defendants sued herein as

4  Does 1 through 25.  Plaintiff will amend this Complaint to state their true names and capacities when

5  ascertained.  Plaintiff is informed and believes, and based thereon alleges, that each of the Doe

6  Defendants is in some manner responsible for damages alleged herein.

7    4.    Plaintiff is informed and believes, and based thereon alleges, that Defendants, and

8  each of them, were and are the agents, servants, employees, and representatives of each of the other

9  Defendants, and in doing the things herein alleged, acted within the scope and course of such

10  agency, service, employment and/or representation.

11    5.    This Court has subject matter jurisdiction over this action under its diversity

12  jurisdiction, pursuant to 28 U.S.C. § 1332(a), because: (a) the amount in controversy exceeds

13  $75,000, exclusive of interest and costs; and (b) Plaintiff and Defendant are citizens of different

14  states.

15    6.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2), because a

16  substantial part of the events and/or omissions giving rise to the claim occurred in San Francisco

17  California.

18  **BACKGROUND ON FACTORING[1]**

19    7.    Plaintiff is a financial services company which, among other things, provides

20  financing facilities to its customers including but not limited to factoring facilities which involves

21  the purchase of "Accounts[2]" from businesses.  In factoring, the entity that purchases the Accounts is

22  known as the "Factor."  The entity from which the Factor purchases the Accounts is the "Factoring

23

24

25  [1] This action which involves secured transactions is governed by the Uniform Commercial Code, as adopted in the State of Montana as its Uniform Commercial Code ("UCC") under Title 30 Trade and Commerce.  Under the UCC, the law governing perfection and priority of a security interest in

26  collateral is governed by the local law of the jurisdiction where the debtor and/or the collateral is located. [*See* Mont. Code Ann. § 30-9A-301(1) and (2).]

27  [2] The term "Account" references the term as defined in the, in relevant part as "…a right to payment of a monetary obligation, whether or not earned by performance, (A) for property that has been or is

28  to be sold, leased, licensed, assigned, or otherwise disposed of, (B) for services rendered or to be rendered, …." [*See* Mont. Code Ann. § 30-9A-102(1)(b)(i).]

COMPLAINT

LEVINSON ARSHONSKY & KURTZ, LLP

3028-001/910339_5.docx

1  Client."  The Factoring Client's customer, who owes payment on the Account is an "Account

2  Debtor.[3]"

3       8.     As a Factor, Plaintiff advances funds to its Factoring Clients by purchasing the

4  Factoring Client's Accounts and advancing a percentage of the account value.  Plaintiff also takes a

5  security interest in the Factoring Client's assets (including but not limited to all of its Accounts) to

6  secure repayment of the Factoring Client's obligations. In collecting on its purchased and assigned

7  Accounts and to evidence its ownership and security interest in same, Plaintiff or the Factoring

8  Client provides notice to all of the Factoring Client's Customers (i.e., its Account Debtors).  The

9  notice tells the Account Debtors that the Factoring Client's Accounts have been assigned to Plaintiff

10  for payment and that obligations owed to the Factoring Client are to be paid directly to Plaintiff

11  (including amounts owed on Accounts which the Factor has not purchased).  With respect to the

12  Accounts that the Factor has purchased, once purchased, the Factoring Client does not retain any

13  legal or equitable interest in the Account Sold.  *See* Mont. Code Ann. § 30-9A-318(1)[4].  Thus, all

14  legal and equitable interests in the sold Accounts, including the exclusive right to receive payment

15  from the Account Debtor, vest with Plaintiff.

16  <center>**THE SUBJECT AGREEMENTS**</center>

17       9.     On or about October 30, 2018, Plaintiff entered into a Factoring and Security

18  Agreement ("Factoring Agreement"), with non-party County X-Press Inc. ("CXPI"), a Montana

19  corporation, whereby, among other things, Plaintiff agreed to purchase accounts from CXPI under an

20  agreed upon formula based on CXPI's accounts receivable.  A true and correct copy of the Factoring

21  Agreement, as redacted, but together with all addendums thereto, is attached hereto as **Exhibit A** and

22  is fully incorporated herein by this reference.

23       10.    Pursuant to the Factoring Agreement, Plaintiff purchased Accounts from and

24  provided advances to CXPI.  Furthermore, under the Factoring Agreement, CXPI granted Plaintiff a

25  security interest in all of its assets, then-existing and after-acquired, which included, but is not

---

27  [3] Mont. Code Ann. § 30-9A-102(1)(c) defines "Account Debtor," in relevant part, as "…a person
obligated on an account, chattel paper, or general intangible."

28  [4] Mont. Code Ann. § 30-9A-318(1) provides: "A debtor that has sold an account, chattel paper,
payment intangible, or promissory note does not retain a legal or equitable interest in the collateral
sold."

<center>3</center>

1  limited to all accounts, inventory, equipment general tangibles, chattel paper, and deposit accounts,

2  referred to in financing agreements as the Collateral.  Plaintiff perfected its security interest in the

3  Collateral by, among other things, filing with the Montana Secretary of State a UCC-1 Financing

4  Statement on October 31, 2018 bearing file number 1810312310820 (the "UCC-1".)  A true and

5  correct copy of the filed UCC-1 is attached hereto as **Exhibit B** and is fully incorporated herein by

6  this reference.

7       11.    Plaintiff is informed and believes, and based thereon alleges, that CXPI is a

8  commercial trucking company that provides ground-based shipping services.

9       12.    Plaintiff is further informed and believes, and based thereon alleges, that at all

10 relevant times hereto, Defendant was a customer and Account Debtor of CXPI and that CXPI

11 provided trucking and/or other transportation services to Defendant pursuant to oral or written

12 agreements entered into between CXPI and Defendant, the precise terms of which are within

13 Defendant's knowledge, and/or at Defendant's specific request for such services.

14      13.    Plaintiff is informed and believes, and based thereon alleges, that Defendant, as

15 consignor or shipper (*i.e.,*the supplier or owner of commodities to be shipped) hired CXPI as the

16 carrier (*i.e.,* the company that transports the goods) to transport its goods for delivery to its various

17 consignees (*i.e.,* the party to whom the goods have been consigned).

18      14.    Plaintiff is informed and believes, and based thereon alleges, that Defendant managed

19 and kept track of its requested services via an electronic, proprietary vendor management system

20 which Plaintiff believes was called the McKesson Supply Chain Reports.

21      15.    Plaintiff is informed and believes, and based thereon alleges, that pursuant to

22 Defendant's requests for transportation services, CXPI would generate invoices with 30-day

23 payment terms and those invoices would be provided to Defendant for payment.

24      16.    Plaintiff is informed and believes, and based thereon alleges, that Defendant kept

25 track of its request for services, invoices, and deliveries through its electronic proprietary vendor

26 management system and would send Invoiced Shipment Reports to CXPI via email from

27 McKessonSupplyChainReports@McKesson.com providing status of the invoice, including Delivery

28 End Dates, costs, and other information.

LEVINSON ARSHONSKY & KURTZ, LLP

17.     After entering into the factoring arrangement with Plaintiff, CXPI, upon receipt of the Invoiced Shipment Reports, CXPI would then forward those reports to Plaintiff to confirm status of the invoices, delivery, and amounts, effectively verifying the validity of the invoices.

## THE NOTICE OF ASSIGNMENT

18.     Pursuant to the Factoring Agreement and Mont. Code Ann. Mont. Code Ann. § 30-9A-406(1)[5], on or about November 28, 2018, Plaintiff caused to be sent to Defendant a notice of the assignment, signed by Plaintiff and CXPI, of CXPI's Accounts to Plaintiff (the "Notice of Assignment"). The Notice of Assignment advised Defendant about the financing relationship between Plaintiff and CXPI, specifically notifying Defendant that that the arrangement included "the sale and assignment of all existing and future accounts that are or become due on their accounts to OpenRoad Financial Services, Inc. under the Uniform Commercial Code." Furthermore, the Notice of Assignment directed Defendant to make "all future payments" to Plaintiff at the addresses indicated therein. In addition, the Notice of Assignment further advised that Defendant "make the proper notations on [their] ledger" and that the "notice and instructions [therein] will remain in full force and effect until [they] are notified to the contrary in writing by OpenRoad Financial Services, Inc." A true and correct copy of the Notice of Assignment is attached hereto as **Exhibit C** and is fully incorporated herein by this reference.

19.     In addition to the Notice of Assignment, all of the invoices for the Accounts that were factored by Plaintiff and sent to Defendant also bore a stamp setting forth remittance instructions indicating payments were to be made to Plaintiff at the designated addresses/bank account information for Plaintiff, along with a warning instructing as follows, "DO NOT send payment to Carrier!"

20.     Defendant received the Notice of Assignment and, to facilitate payment, transmitted an Electronic Payment Agreement ("Vendor Form") to Plaintiff to facilitate electronic payments to Plaintiff. Plaintiff returned the completed Vendor Form to Defendant.

///

---

[5] Which provides, in relevant part that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor."

LEVINSON ARSHONSKY & KURTZ, LLP

LEVINSON ARSHONSKY & KURTZ, LLP

**THE SUBJECT ACCOUNTS AND DEFENDANT'S DEFAULT**

21.     After receipt of the Notice of Assignment, as well as the completed and executed Vendor Form, Defendant, for a time, complied with the directive in the Notice of Assignment by making payments to Plaintiff of the amounts owed to CXPI.

22.     However, Defendant became delinquent on its payment obligations and ceased making payments altogether to Plaintiff since in or about August of 2019.

23.     Outstanding invoices for services provided by CXPI to Defendant were mostly billed to Defendant's San Francisco office and were dated between September 3, 2019 and October 15, 2019 (the "Subject Invoices"). The Subject Invoices were purchased by Plaintiff and remain unpaid despite the fact that all services were completed.  True and correct copies of the Subject Invoices are collectively attached hereto as composite **Exhibit D** and are fully incorporated herein by this reference.

24.     The total principal amount of the payments that remain outstanding with respect to the Subject Invoices is $226,974.58.

25.     In addition to the Subject Invoices, Plaintiff is informed and believes, and based thereon alleges, that additional amounts became due and owing by Defendant to CXPI, which constitute Plaintiff's secured collateral and are assigned to Plaintiff for payment.  Plaintiff does not know the full extent of amounts owed by Defendant regarding services provided by CXPI which were not factored by Plaintiff.

26.     Additionally, Plaintiff is informed and believes, and based thereon alleges, that Defendants paid all or part of the Subject Invoices and/or additional invoices or other amounts incurred directly to CXPI and and/or someone other than Plaintiff—contrary to the directive in the Notice of Assignment. Plaintiff does not know the full extent of the amounts paid over notice.

**PLAINTIFF'S AUTHORITY TO COLLECT THE SUBJECT ACCOUNTS**

27.     Division 9 (Secured Transactions) of the UCC governs Plaintiff's authority to collect on the Subject Invoices, other invoices, and all amounts owed to CXPI from Defendant.  As assignee of CXPI's Accounts (the "Subject Accounts[6]") and holder of a duly perfected security interest

---

[6] The Subject Accounts includes the Subject Invoices.

3028-001/910339_5.docx

therein, Plaintiff has authority under the UCC to enforce its Notice of Assignment and obtain full payment on the Subject Accounts from Defendant.

28. Pursuant to the Factoring Agreement, Plaintiff advanced funding to CXPI to purchase the Subject Invoices, and Plaintiff was granted a security interest in, and took assignment of, all of CXPI's Accounts, including the Subject Invoices.  The Factoring Agreement also authorized Plaintiff to collect the Accounts of CXPI from CXPI's Account Debtors such as the Defendant.  In addition, CXPI was in default of its obligations under the Factoring Agreement.  Pursuant to Mont. Code Ann. § 30-9A-201(1), the terms of the Factoring Agreement were effective as between CXPI and Plaintiff and as against all creditors of CXPI.  And, under Mont. Code Ann. § 30-9A-607(1), pursuant to the agreement of CXPI under the Factoring Agreement, Plaintiff has authority, among other things, to both:

> "(a)   "[n]otify an account debtor or other person obligated on collateral to make payment . . . to . . . the secured party," and

> (c)    "[e]nforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment ... to the debtor."

29. As a result, pursuant to the terms of the Factoring Agreement and Mont. Code Ann. § 30-9A-607(1), Plaintiff can exercise its rights to its Collateral by, among other things, enforcing Defendant's obligation to pay for CXPI's services and other charges due under the Subject Accounts.

30. Despite Plaintiff's multiple demands for payment, Defendant has failed to pay its total outstanding obligations.

31. With this action, Plaintiff seeks to recover the amounts still due and owing from Defendant on the Subject Accounts.

///

///

///

LEVINSON ARSHONSKY & KURTZ, LLP

**FIRST CLAIM FOR RELIEF**

(Breach of Contract Pursuant to Common Law and Mont. Code Ann.

§§ 30-1-106, 30-9A-201, 30-9A-201, 30-9A-318, 30-9A-406, 30-9A-607 against all Defendants)

32.    Plaintiff realleges, refers to, and incorporates by reference paragraphs 1 through 31, inclusive, of this Complaint as though fully set forth herein.

33.    Plaintiff is informed and believes, and on that basis alleges, that Defendant and CXPI entered into the written and/or oral agreements, the exact terms of which are specifically within Defendant's knowledge, but in which Plaintiff is informed and believes that, Defendant, as consignor or shipper hired CXPI as the carrier to transport Defendants goods for delivery to Defendant's various consignees, at agreed upon rates/fees.

34.    Plaintiff is informed and believes, and based thereon alleges, that Defendant managed and kept track of its requested services via an electronic, proprietary vendor management system which Plaintiff believes was called the McKesson Supply Chain Reports.

35.    Plaintiff is informed and believes, and based thereon alleges, that pursuant to Defendant's requests for transportation services, CXPI would generate invoices with 30-day payment terms and those invoices would be provided to Defendant for payment.

36.    Plaintiff is informed and believes, and based thereon alleges, that Defendant kept track of its request for services, invoices, and deliveries through its electronic proprietary vendor management system and would send Invoiced Shipment Reports to CXPI via email from McKessonSupplyChainReports@McKesson.com providing status of the invoice, including Delivery End Dates, costs, and other information.

37.    Upon receipt of the Invoiced Shipment Reports, CXPI would then forward those reports to Plaintiff to confirm status of the invoices, delivery, and amounts, effectively verifying the validity of the invoices.

38.    Plaintiff is further informed and believes, and on that basis alleges, that the Subject Invoices accurately reflect amounts due from Defendant for CXPI's services and related charges supplied to, or incurred for the benefit of, Defendant from in or about September 2019 through October 2019 in compliance with any of the agreements between CXPI and Defendant.

LEVINSON ARSHONSKY & KURTZ, LLP

39.     Plaintiff is further informed and believes, and on that basis alleges, that CXPI provided additional services outside of the Subject Invoices, in compliance with the agreements between CXPI and Defendant, for which CXPI issued invoices to Defendant for these services and for which payment is owed by Defendant to CXPI.  The exact amount of the payments owed is currently unknown but will be subject to proof at trial.

40.     Plaintiff is further informed and believes, and on that basis alleges, that CXPI fully performed all of its obligations under the terms of the parties' agreements and that CXPI satisfied all conditions precedent to Defendant's duty to issue payment to CXPI under the agreements, except for any obligations or conditions excused or waived by Defendant's nonperformance or other conduct.

41.     Moreover, as evidenced by, among other things, its payments on prior CXPI Invoices, Defendant received and assented to the terms of the Notice of Assignment, which provided notice that CXPI's Account had been assigned to Plaintiff and that all payments on that Account should be remitted *only* to Plaintiff.  Plaintiff fully performed all of its obligations under the terms of the Notice of Assignment and satisfied all conditions precedent to Defendant's duty to issue payment to Plaintiff under its terms, except for any obligations or conditions excused or waived by Defendant's nonperformance or other conduct.

42.     Plaintiff is further informed and believes, and based thereon alleges, that payment on the Subject Accounts was due from Defendant to Plaintiff, pursuant to the Factoring Agreement and the Notice of Assignment.

43.     As set forth *supra*, Plaintiff was the owner of and/or the assignee of the rights to payment on the Subject Accounts arising from the services provided by CXPI to, or for the benefit of, Defendant.  Plaintiff also held a duly perfected security interest in the Subject Accounts under the Factoring Agreement.  After assigning the Subject Accounts to Plaintiff, CXPI retained no further interest in the Subject Accounts pursuant to Mont. Code Ann. § 30-9A-318.  Pursuant to Mont. Code Ann. §§ 30-9A-201, 30-9A-201, 30-9A-318, 30-9A-406, 30-9A-607, Plaintiff, alone, was entitled to receipt of payments from Defendant on the Subject Accounts and as CXPI was in default of its obligations, Plaintiff is entitled to enforce the obligations on the Accounts. In fact, pursuant to the ///

3028-001/910339_5.docx

1  terms of the Notice of Assignment, as acknowledged by Defendant's prior payments to Plaintiff, all

2  payments were to be made solely to Plaintiff.

3      44.    By failing to pay to Plaintiff the amounts due and owing for CXPI's services under

4  the Subject Invoices, Defendant breached the terms of its agreements with CXPI, breached the

5  Notice of Assignment, and failed to discharge its obligations to pay for CXPI's work pursuant to

6  Mont. Code Ann. § 30-9A-406(1).

7      45.    Despite Plaintiff's demands, to date, Defendant has refused to pay Plaintiff any

8  portion of the amounts due and owing on the Subject Accounts.

9      46.    As a result of Defendant's breaches, Plaintiff has been damaged in the amount of, at

10  least, $226,974.58, plus accruing costs, and applicable prejudgment interest.

11  <u>**SECOND CLAIM FOR RELIEF**</u>

12  (Services Rendered against all Defendants)

13      47.    Plaintiff refers to and incorporates by reference paragraphs 1 through 31 of this

14  Complaint as though set forth fully herein.

15      48.    As set forth *supra*, and within the two (2) years last past, CXPI provided professional

16  trucking and/or other transportation services at the request of Defendant.  Invoices memorializing the

17  amounts due from Defendant for those services were, in turn, sent to Defendant to request payment

18  for the services.

19      49.    As set forth *supra*, Plaintiff was the assignee of the rights to payment on the Subject

20  Accounts arising from the services provided by CXPI to, or for the benefit of, Defendant. Plaintiff

21  also held a duly perfected security interest in the Subject Accounts under the Factoring Agreement.

22  After selling and/or assigning the Subject Accounts to Plaintiff, CXPI retained no further interest in

23  the Subject Accounts pursuant to Mont. Code Ann. § 30-9A-318.  Pursuant to Mont. Code Ann. §§

24  30-9A-201, 30-9A-201, 30-9A-318, 30-9A-406, 30-9A-607, Plaintiff, alone, was entitled to receipt

25  of payments from Defendant on the Subject Accounts.

26      50.    Defendant received notice of Plaintiff's right to payment for the services performed

27  by CXPI and, indeed, previously complied with the directive by paying Plaintiff. Pursuant to the

28  terms of the Notice of Assignment, all payments were to be made solely to Plaintiff.

LEVINSON ARSHONSKY & KURTZ, LLP

51.     Despite Plaintiff's demand for payment, Defendant has refused to make payment to Plaintiff for the services that Defendant received.

52.     As a result, Defendant is indebted to Plaintiff, in the amount of, at least, $226,974.58, plus accruing costs and applicable prejudgment interest.

**THIRD CLAIM FOR RELIEF**

(Beach of Statutory Duty to Pay Pursuant to Mont. Code Ann.

§§ 30-1-106, 30-9A-201, 30-9A-201, 30-9A-318, 30-9A-406, 30-9A-607 Against all Defendants)

53.     Plaintiff refers to and incorporates by reference paragraphs 1 through 52 of this Complaint as though set forth fully herein.

54.     On or about October 30, 2018, CXPI sent Defendant a Notice of Assignment, attached hereto as Exhibit C, whereby CXPI advised Defendant about the financing relationship between Plaintiff and CXPI and specified that the agreement between Plaintiff and CXPI included "the sale and assignment of all existing and future accounts that are or become due on their accounts to OpenRoad Financial Services, Inc."  Furthermore, the Notice of Assignment directed Defendant to make "all future payments" to Plaintiff at the address indicated therein.  In addition, the Notice of Assignment further advised that the "notice and instructions herein will remain in full force and effect until you are notified to the contrary in writing by OpenRoad Financial Services, Inc."

55.     Despite its receipt of the authenticated Notice of Assignment and Plaintiff's demands for payment of all outstanding amounts owed on the Subject Accounts, including the Subject Invoices, Defendant has refused to pay Plaintiff on the outstanding obligations.

56.     Furthermore, despite its receipt of the authenticated Notice of Assignment, Defendant disregarded the payment instructions and made payments directly, to CXPI and/or a person or entity other than Plaintiff in an amount to be determined at trial, which payments were contrary to the directive in the Notice of Assignment and without having been instructed, *in writing,* by Plaintiff to do so.

57.     Pursuant to Mont. Code Ann. § 30-9A-406, such payments do not discharge Defendant's obligation to pay Plaintiff.

///

LEVINSON ARSHONSKY & KURTZ, LLP

3028-001/910339_5.docx

58.     Pursuant to Mont. Code Ann. §§ 30-1-106, 30-9A-201, 30-9A-201, 30-9A-318, 30-9A-406, and 30-9A-607, Plaintiff, alone, was entitled to receipt of payments from Defendant on the Subject Accounts and is entitled to enforce Defendant's obligations thereunder.

59.     Accordingly, there is now due, owing, and unpaid from Defendant to Plaintiff the sum of *at least* $226,974.58, plus accruing costs and applicable prejudgment interest.

### FOURTH CLAIM FOR RELIEF

(Declaratory Relief against all Defendants)

60.     Plaintiff refers to and incorporates by reference paragraphs 1 through 59 of this Complaint as though set forth fully herein.

61.     Plaintiff is informed and believes, and based thereon alleges that an actual and justifiable controversy has arisen and now exists between the parties in which Plaintiff contends and Defendant denies: (i) that Plaintiff holds a valid, first priority security interest in all of CXPI's Assets including its Accounts and General Intangibles, among other assets, as defined in the Factoring Agreement (the "Collateral"); (ii) that Defendant is obligated to make payment to Plaintiff on the Subject Accounts pursuant to its obligations under its agreements with CXPI, the Notice of Assignment, and its obligations under the UCC; and (iii) that Defendant is obligated to make payment to Plaintiff on the amounts paid over notice to anyone other than Plaintiff.

62.     Plaintiff is informed and believes, and based thereon alleges, that a judicial determination is necessary and appropriate so that the parties may ascertain their respective rights and obligations with respect to the Subject Accounts and pursuant to the UCC in regards to the alleged amounts of the outstanding debt.

63.     As a result of the foregoing, Plaintiff is entitled to a declaratory judgment to the effect that, Plaintiff is entitled to an award against Defendant for the total amounts owed under the Subject Accounts and the amounts paid over notice.

### FIFTH CLAIM FOR RELIEF

(Accounting against all Defendants)

64.     Plaintiff realleges and incorporates herein by reference as though fully set forth in full the allegations of Paragraphs 1 through 63, inclusive.

LEVINSON ARSHONSKY & KURTZ, LLP

65.    In addition to purchasing the Subject Invoices, Plaintiff holds a valid, first priority security interest in all of CXPI's Assets including its Accounts and General Intangibles, among other assets, as defined in the Factoring Agreement as the Collateral. Thus, Defendant is obligated to make payment to Plaintiff on all invoices, whether purchased or not, pursuant to its obligations under its agreements with CXPI, the Notice of Assignment, and its obligations under the UCC.  Based upon Defendant's wrongful acts and conduct, Plaintiff is entitled to an accounting of all amounts owed by Defendant to CXPI, whether or not Plaintiff purchased said invoices.

66.    Furthermore, as Defendant's payment obligations to Plaintiff are not discharged when Defendant makes payment on amounts owed on CXPI's Accounts to anyone other than Plaintiff, Plaintiff is entitled to an account of the amounts paid over notice by Defendant to anyone other than Plaintiff.

67.    Plaintiff further requests that this Court enter orders against Defendant for damages as found by the accounting.

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and against Defendant as follows:

As to the First, Second, and Third Causes of Action

1.    For monetary damages, in an amount subject to proof, of at least $226,974.58;

As to the Fourth Cause of Action

2.    For a declaration that Plaintiff is entitled to an award against Defendant for the total amount owed under the Subject Invoices;

3.    For a declaration that Plaintiff is entitled to an award against Defendant for the total amounts paid over notice;

As to the Fifth Cause of Action

4.    For an order requiring that Defendant account fully for all amounts owed on CXPI accounts, whether or not purchased/factored by Plaintiff;

5.    For an order requiring that Defendant account fully for all amounts paid over notice on CXPI Accounts to anyone other than Plaintiff;

6.    For damages as found by the accounting;

1    <u>As to All Claims for Relief</u>

2         7.     For prejudgment interest at the legal rate; and

3         8.     For such other and further relief as the Court may deem just and proper.

4

5    Dated:  February 20, 2020        LEVINSON ARSHONSKY & KURTZ, LLP

6

7                    By:  */s/ Anne C. Manalili*

8                        ANNE C. MANALILI
                Attorneys for Plaintiff OPENROAD FINANCIAL

9                    SERVICES, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEVINSON ARSHONSKY & KURTZ, LLP

# EXHIBIT "A"

## FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT (Agreement) is entered into between OpenRoad Financial Services Inc., (Purchaser), with offices located at PO Box 484, Dallas, OR 97338, and County X-Press Inc, (Seller), with offices located at PO Box 17741, Missoula, MT 59808.

Purchaser and Seller agree that the following shall constitute the terms upon with Purchaser shall act as Client's sole factor:

1.    **Definitions.**

    **1.1**    **"Accounts"** – all contract rights, documents, notes, instruments and all other forms of obligations owed to or owned by Seller, all general intangibles relating thereto, all proceeds thereof, all guaranties, supporting obligations and security therefore, and all goods and rights represented thereby and arising therefrom, including, but not limited to, returned, reclaimed and repossessed goods and the rights of stoppage in transit, replevin and reclamation.

    **1.2**    **"Avoidance Claim"** – means the assertion, complaint, judgment or otherwise against Purchaser, any payment Purchaser received with respect to any Account, whether the amount related thereto was paid by the Account Debtor, the Seller, on behalf of Seller or for its benefit, or any lien granted to Purchaser is avoidable (or recoverable from Purchaser) under the Bankruptcy Code, any other debtor relief statute, including, but not limited to, preference claims, fraudulent transfer claims, or through receivership, assignment for the benefit of creditors or any equivalent recovery law, rule or regulation which relates to the adjustment of debtor and creditor relations.

    **1.3**    **"Collateral"** – all of Seller's now owned or hereafter acquired Accounts, Equipment, Inventory, Goods, Financial Assets, Chattel Paper, Electronic Chattel Paper, Letters of Credit, Letter of Credit Rights, General Intangibles, Investment Property, Deposit Accounts, Instruments, the Reserve, Commercial Tort Claims, Supporting Obligations, Carrier Liens, all books, records, files and computer data related to the foregoing, and all proceeds of the foregoing.

    **1.4**    **"Dispute"** – any dispute, deduction, claim, offset, defense or counterclaim of any kind whatsoever, regardless of whether the same is in an amount greater than, equal to or less than the Account concerned, regardless of whether the same is valid or bona fide, regardless of whether the same in whole or in part relates to the Account on which payment is being withheld or other Accounts or goods or services already paid for, and regardless of whether the same arises by reason of an act of God, civil strife, war, currency restriction, foreign political restriction or regulation, or the like, or any other reason.

    **1.5**    **"Eligible Account"** – an Account which is acceptable for purchase as determined by Purchaser, in its sole discretion.

    **1.6**    **"Invalid Invoice Fee"** – ▮ percent (▮) of the Gross Invoice Amount of any purchased Account as liquidated damages for failure to comply with Section 4.7(a) herein.

    **1.7**    **"Maximum Factoring Advances Percentage"** – shall mean, as of the date of determination by Purchaser, in its sole discretion, an amount up to the percentage set forth in Schedule A, No. 1 of the Purchase Price of all outstanding Accounts purchased from Seller by Purchaser.

    **1.8**    **"Missing Notation Fee"** – ▮ percent (▮) of the Gross Invoice Amount of any purchased Account as liquidated damages for failure to comply with Section 2.6.

    **1.9**    **"Misdirected Payment Fee"** – ▮ percent (▮) of the amount of any payment on account of a purchased Account which has been received by Seller and not delivered to Purchaser on the business day following receipt by Seller.

    **1.10**    **"Obligations"** – shall mean and include each and all of the following: the obligation to pay and perform when due all debts and all obligations, liabilities, covenants, agreements, guaranties, warranties and representations of Seller to Purchaser, of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable from Seller to Purchaser howsoever created, incurred, acquired, arising or evidenced; whether primary, secondary, direct, absolute, contingent, fixed, secured, unsecured, or otherwise; whether as principal or guarantor; liquidated or unliquidated; certain or uncertain; determined or undetermined; due or to become due; as a result of present or future advances or otherwise; joint or individual; pursuant to or caused by Seller's breach of this Agreement, any Special Accommodation Agreement, or any other present or future agreement or instrument, or created by operation of law or otherwise; evidenced by a written instrument or oral; created directly between Purchaser or owed by Seller to a third party and acquired by Purchaser from a third party; monetary or nonmonetary.

    **1.11**    **"Reserve"** – a bookkeeping account on the books of Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

**1.12** **"Special Accommodation"** – shall mean financial accommodations that Purchaser may provide to Seller, in Purchaser's sole discretion, in excess of the Maximum Factoring Advances Percentage; an addendum letter agreement or other document, entered by and between Purchaser and Seller separate and apart from this Agreement, shall memorialize the fees, repayment terms, and other conditions governing the Special Accommodation (the "Special Accommodation Agreement").

## 2. Factoring.

**2.1** **Sale of Accounts.** Seller shall present to Purchaser Eligible Accounts for purchase pursuant to this Agreement in a form acceptable to Purchaser in Purchaser's sole discretion. Seller agrees that it will do all of its business through Purchaser as Seller's sole factor and Seller hereby assigns and sells to Purchaser, as absolute owner, all Accounts. Purchaser shall be under no obligation to purchase Seller's Accounts and shall only purchase Eligible Accounts.

**2.2** **Purchase Price of Accounts.** The Purchase Price of each Eligible Account accepted by Purchaser shall be the gross face amount of the Account (the "Gross Invoice Amount") less all credits, discounts and allowances, granted to, or claimed by, the Account Debtor and disclosed to Purchaser prior to Purchaser's purchase of the Eligible Account.

**2.3** **Factoring Fees.** Purchaser shall charge Seller the Discount Fee for each Account as provided for in Schedule A, No. 2.

**2.4** **Reserve.** Purchaser shall charge and retain an amount equal to the inverse of the Maximum Factoring Advances Percentage, which amount shall be held as the Reserve. Purchaser may, from time to time, at its sole discretion, charge the aggregate Reserve with: (a) any losses which may be incurred in relation to any Account purchased hereunder; (b) any Account that Purchaser determines are not Eligible Accounts; (c) anticipated fees identified and payable under this Agreement; (d) any other obligation due to Purchaser under this Agreement; or (e) other amounts that Purchaser deems appropriate in its sole discretion. Purchaser agrees to maintain the Reserve mentioned herein, the maintenance of which, however, shall not vest the Seller any right, title, or interest therein, it being understood that the amounts held as the Reserve shall be kept as a reserve to pay the Obligations of the Seller incurred under the provisions of this Agreement. Provided that there is no Event of Default, Purchaser, in its sole discretion, may initiate rebates to Seller from the Reserve, according to the timing specified at Schedule A, No. 5. Purchaser, in its sole discretion, may adjust the percentage of the Reserve.

**2.5** **Repurchase Rights.** Purchaser may require that Seller immediately repurchase, by payment of the then unpaid face amount of any purchased Account, together with any unpaid fees and other amounts owed relating to the purchased Account on demand, or at Purchaser's option, by Purchasers charge to the Reserve, upon the following events: (a) an Account is not paid by the Account Debtor within ninety (90) days of the date set forth on the invoice for the purchased Account; (b) Seller has breached any warranties or promises in this Agreement with regard to an unpaid Account; (c) Seller and Account Debtor are involved in a Dispute of any kind, regardless of validity; and/or (d) the Account Debtor asserts a claim of loss of any kind against Seller and/or Purchaser.

**2.6** **Assignments and Other Documentation.** All bills and invoices for all Accounts assigned to or purchased by Purchaser hereunder shall bear the following legend: "This account has been assigned to and is owned by and payable only to OpenRoad Financial Services Inc. at PO BOX 484, Dallas, OR 97338. Any objection to this invoice must be reported Purchaser, at said address." In the event that Seller sends to an Account Debtor any invoice evidencing a purchased Account, which does not contain such notation (or such other notation otherwise acceptable to Purchaser as provided for in this Section), it will be impracticable or extremely difficult to determine the resulting damages suffered by Purchaser. It is therefore agreed that Seller shall immediately pay to Purchaser as liquidated damages the Missing Notation Fee. This Section shall not be construed to create any liability on the part of Purchaser for any errors in affixing said notation to any bills or invoices generated by Purchaser on behalf of Seller. Seller shall immediately provide to Purchaser such additional information as requested by Purchaser relating to any Account.

**2.8** **Term of this Agreement, Minimum Discount Fee.** This Agreement shall be in effect for the Original Term and shall automatically renew for consecutive Renewal Terms unless terminated by either party giving the other written notice not less than thirty (30) days prior to the end of the Original Term or any Renewal Term, which written notice shall clearly state its intention to terminate at the end of the current term. Purchaser may terminate this Agreement at any time after an Event of Default. As consideration for Purchaser making the necessary financial accommodations and foregoing other factoring opportunities available in the market place, Seller agrees to pay the Purchaser during the Original Term and for each Renewal Term, the Minimum Monthly Discount Fee. If, at the end of each monthly period, the Discount Fees paid by Seller is less than the Minimum Monthly Discount Fee, Purchaser may charge Seller with the amount of such deficiency. If Seller terminates this Agreement at any time prior to the expiration of the Original Term, or any subsequent Renewal Term, or if the Purchaser terminates this Agreement at any time upon the occurrence of an Event of Default, Seller shall remain obligated to pay the total of the Minimum Monthly Discount Fee for the time remaining for the Original Term or Renewal Term, as the case may be.

**2.9** **Seller's Post-Termination Liability.** After termination, Seller shall be liable to Purchaser for the full and prompt payment of the full amount of purchased Accounts, which are then outstanding and unpaid, disputed or undisputed, as well as any other then outstanding Obligation. Purchaser continues to have a security interest in the Collateral of Seller until all Obligations of Seller are paid in full.

**2.10    Other Fees and Costs**. Seller shall pay Purchaser all other fees and costs incurred hereunder immediately when due, including, but not limited to, those fees and costs listed at Schedule A, No. 6.

3.   **Collateral, Grant of Security Interest, ACH Authorization; Online Access to Deposit Accounts, Fuel Advances.**

**3.1    Collateral.** As security and collateral for the Obligations, Seller hereby grants Purchaser a continuing security interest in, and assigns to Purchaser, all of Seller's right, title and interest in and to the Collateral.

**3.2    Filing Authorization.** Seller hereby authorizes Purchaser to file any document they deem necessary to perfect their security interest in the Collateral, including, but not limited to, financing statements and any applicable amendments or continuation statements.

**3.3    ACH Authorization; Online Access to Deposit Accounts.** In order to satisfy any of the Obligations and facilitate the purchase of Accounts, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH.  This authorization is irrevocable. In addition, to facilitate funding and the administration of this Agreement, at Purchaser's request, Seller shall provide to Purchaser any and all login identifications and passwords required for online access to Deposit Accounts maintained by Seller. Purchaser is authorized to review Seller's Deposit Accounts at any time, and Seller shall immediately notify Purchaser of any change in the login identifications or passwords for the Deposit Accounts.

**3.4    Fuel Advances.** Standard fee per fuel advance for EFS is $35.00 during the week & $50.00 on weekends. ORFS requires that ALL loads that receive an advance be factored through ORFS or a minimum $300 fee will apply.  No outside or other advances can be taken on ORFS factored loads and are prohibited.  If an outside advance is taken, ORFS reserves the right to charge full amount of the linehaul on the load advanced or being factored. We can advance up to 50% (not to exceed $2500) of the linehaul on each load. Paperwork needs to be received no later than 48 hours after delivery.  If paperwork is received after 48 hours after delivery, it is up to ORFS sole discretion to apply a 10% late fee of the gross linehaul.

4.   **Representations, Warranties and Covenants of Seller.** To induce Purchaser to enter into this Agreement, Seller represents and warrants that each of the following representations and warranties now is and hereafter will continue to be true and correct in all respects and Seller has and will timely perform each of the following covenants:

**4.1    Validity of Accounts.** Seller represents, warrants and covenants, as to each Account sold and assigned hereunder that, at the time of its creation and at the time it is assigned to Purchaser hereunder, the Account is a valid, bona fide account, representing an undisputed indebtedness incurred by the named account debtor for goods actually sold and delivered or for services completely rendered; there are no setoffs, offsets or counterclaims, genuine or otherwise, against the Account; the Account does not represent sale of goods or services provided to a parent, subsidiary or affiliate or a consignment, sale or return or a bill and hold transaction; no agreement written, oral, or otherwise, exists permitting any deduction or discount (other than the discount stated on the invoice);  Seller is the lawful owner of the Account and has the right to sell and assign the same to Purchaser; the Account is free of all security interests, liens and encumbrances other than those in Purchaser's favor, and the Account is due and payable in accordance with its terms. Without limiting the foregoing, Seller has not granted a security interest to a bank or any other creditor, which security includes the Accounts and/or all of the "present and after acquired property" of the Client.

**4.2    Liens.** Seller shall not grant or permit or suffer to exist any lien upon or security interest in Seller's current assets in favor of any party other than Purchaser without Purchaser's written consent.

**4.3    Solvency.** Seller is a solvent entity in good standing under the laws of the state of its formation and qualified in all States where such qualification is required; the execution, delivery and performance of this Agreement has been duly authorized and is not in contravention of any applicable law, Seller's corporate charter or by-laws, if applicable, or any agreement or order by which Seller is bound.

**4.4    Corporate Name and Location.** Seller shall not change its corporate name, company name, or trade name or the location of Seller's office or open any new offices without giving Purchaser at least thirty (30) days prior written notice.  At the present time, Seller represents, warrants and covenants that it only conducts business at the addresses listed herein.

**4.5    Books and Records.** All books and records pertaining to the Accounts or to any current assets owned by Seller shall be maintained solely and exclusively at the Seller's address listed herein and no such books and records shall be moved or transferred without giving Purchaser thirty (30) days prior written notice.

**4.6    No Sale of Property.** Seller shall not sell, lease, transfer or otherwise dispose of all or substantially all of Seller's property or assets, or consolidate with or merge into or with any corporation or other entity without Purchaser's prior written consent.

**4.7    Trade Names.** The trade names or styles set forth herein are the only trade names or styles under which Seller shall transact business; Accounts sold to Purchaser hereunder and represented by invoices bearing such trade names or styles are wholly owned by

3

Seller; the undertaking, representations and warranties made in connection therewith shall be identical to and of the same force and effect as those made with respect to invoices bearing Client's corporate or business name; Client's use of any trade names or styles is in compliance with all laws regarding the use of such trade names or styles. Client shall give Purchaser thirty (30) day's prior written notice of the change of any trade name or style or Seller's use of any new trade name or style.

**4.8    No Discounts.** No Discounts, credits or allowances will be issued, granted or allowed by Seller to customers and no returns will be accepted without Purchaser's prior written consent; provided, however, that until Purchaser notifies Seller to the contrary, Seller may presume Purchaser's consent. Discounts, credits or allowances once issued may be claimed only by the customer.

**4.9    Carrier.** Seller is a motor carrier, who provides motor vehicle transportation for compensation; Seller is not a freight broker or person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier.

**4.10    Complete Disclosure.** There is no fact which Seller has not disclosed to Purchaser in writing which could materially adversely affect the properties, business or financial condition of Seller or any of the Collateral or which is necessary to disclose in order to keep the foregoing representations and warranties from being misleading.

5.    **Administration.**

**5.1 Duties Regarding Accounts.**

(a)    Seller shall, from time to time, execute and deliver to Purchaser confirmatory schedules of Accounts sold to Purchaser, together with the original of each invoice, acceptable evidence of shipment and such other documentation and proofs of delivery as Purchaser may require. Each invoice shall bear a notice, in form satisfactory to Purchaser, that it has been sold and assigned to and is payable only to Purchaser. Seller agrees to prepare all invoices, but Purchaser may do so at Purchaser's option. Purchaser shall mail all invoices unless Purchaser decides, at its option, to permit Seller to mail invoices. Seller agrees to execute and deliver to Purchaser such further instruments of assignment, financing statements and instruments of further assurance as Purchaser may reasonably require. Seller hereby authorized Purchaser to execute on Seller's behalf and file such Uniform Commercial Code (UCC) financing statements as Purchaser may deem necessary in order to perfect and maintain the security interests granted by Seller in accordance with this Agreement and any other agreement between Seller and Purchaser, and Seller further agrees that Purchaser may file this Agreement or a copy thereof as such UCC financing statement. Seller agrees to bear the cost of all filing fees, filing taxes, search reports, legal fees and other charges incurred by Purchaser in the perfection, protection and preservation of the rights and collateral security herein granted to Purchaser.

(b)    If any remittances are made directly to Seller, Seller's employees or agents or representatives, Seller shall act as trustee of an express trust for Purchaser's benefit, hold the same as Purchaser's property and deliver the same to Purchaser forthwith in kind. Failure to deliver misdirected payments in the form received within three (3) business days of receipt may, at the option of Purchaser, result in a ten percent (10%) charge on the amount of the misdirected payment. Purchaser and/or such designee of Purchaser may from time to time appoint or hereby appointed Seller's attorney-in-fact to endorse Seller's name on any and all checks or other forms of remittances received by Purchaser where such endorsement is required to effect collection and to transmit notices to customers, in Seller's name or in Purchaser's, that amounts owing by them have been assigned and are payable directly to Purchaser; this power, being coupled with an interest, is irrevocable.

(c)    Purchaser may, at all times, have access to, inspect and make extracts from all of Client's records, files and books of account. Purchaser may, at any time after default by Seller hereunder, remove from Seller's premises all such records, files and books relating to Accounts. Seller will promptly furnish Purchaser with all statements prepared by or for seller showing Seller's financial condition and the results of Seller's operations and such other statement as Purchaser may reasonably require. Seller authorized Purchaser to communicate directly with Seller's independent certified public accountants, bookkeepers, or accountants, and shall authorize such persons to discuss Seller's financial condition and statements directly with Purchaser.

**5.2    Customer Credit.** If Purchaser determines that the credit standing of a customer has deteriorated after Purchaser has purchased an Account, Seller shall, at Purchaser request, exercise such rights as Seller may have, and Seller hereby grants Purchaser the right to take such steps in Seller's name or Purchaser's name.

**5.3.    Monthly Statement.** Purchaser shall render a monthly statement of account to Seller within twenty (20) days after the end of each month. Such statement of account shall constitute an account stated unless Seller make written objection thereto within thirty (30) days from the date such statement is sent to Seller.

6.    **Application of Payments.** Checks, instruments and all other non-cash payments delivered to Purchaser in payment or on account of the Accounts or the Obligations constitute conditional payment only until such items are actually paid in cash to Purchaser, for the purpose of computing fees earned by Purchaser, credit therefore and for bank wire transfers, shall be given after receipt by Purchaser, as provided for in Schedule A, No. 10. All payments made by or on behalf of, and all credits due to Seller, may be

4

applied and reapplied in whole or in part to any of the Obligations to such extent and in such manner, as Purchaser shall determine in its sole discretion. Purchaser shall have the continuing exclusive right to apply and reapply any and all such payments in such manner as Purchaser shall determine in its sole discretion, notwithstanding any entry by Purchaser upon any of its books and records. Any payments received on any Account not factored by Purchaser shall be placed in the Reserve.

**7.     Events of Default and Remedies.**

**7.1     Events of Default.** The occurrence of any of the following acts or events shall constitute an Event of Default: (a) if Seller fails to make payment of any of the Obligations when due; (b) if Seller fails to make any remittance required by this Agreement; (c) if Seller commits any breach of any of the terms, representations, warranties, covenants, conditions or provisions of this Agreement, or of any present or future supplement or amendment hereto or of any other agreement between Seller and Purchaser; (d) if Seller becomes insolvent or unable to meet Seller's debts as they mature; € if Seller delivers to Purchaser a false financial statement; (f) if Seller calls, or has called by a third party, a meeting of Seller's creditors; (g) if Seller has commenced by or against Seller any bankruptcy proceeding, insolvency, arrangement or similar proceeding; (h) if Seller makes an assignment for the benefit of creditors; (i) if a receiver, receiver and manager, trustee or custodian is appointed in respect of Seller's assets or any of them; (j) if Seller suspends or discontinues doing business for any reason; (k) if a receiver or trustee of any kind is appointed for Seller or any of Seller's property; (l) if any guarantor of Seller's Obligations shall become insolvent or have commenced by or against such guarantor any bankruptcy proceeding, insolvency, arrangement or similar proceeding; (m) if any guaranty of Seller's obligations is terminated; (n) if any change of ownership occurs with respect to more than forty (40%) percent of Seller's capital stock or similar equity interest; or (o) if a notice of lien, levy or assessment is filed of record with respect to all or any of Seller's assets by the United States or any department, agency or instrumentality thereof or by any state, county, municipal or other governmental agency.

**7.2     Remedies.** Upon the occurrence of an Event of Default, Purchaser shall have the right to terminate this Agreement and all other arrangements existing between Seller and Purchaser forthwith and without notice, and the Obligations shall mature and become immediately due and payable and Purchaser shall have the right to withhold any further payments to Seller until all Obligations have been paid in full. In addition, Purchaser shall have all of the rights of a secured party under the Uniform Commercial Code, including without limitation, the right to take possession of any collateral in which Purchaser has a security interest and to dispose of same at public or private sale and Seller will be liable for any deficiency. Purchaser shall not be required to proceed against any collateral but may proceed against Seller directly. In the event any action is brought to enforce, contest, challenge, modify or invalidate the terms of this Agreement, including, but not limited to, any lawsuit or arbitration, Seller agrees to pay Purchaser's costs and reasonable attorney's fees incurred therein.

**9.     General.**

**9.3     Indemnity.** Seller shall indemnify and hold Purchaser harmless from and against any and all claims, debts, losses, demands, actions, causes of action, lawsuits, Avoidance Claims, damages, penalties, judgments, liabilities, costs and expenses (including, without limitation, attorneys' fees), of any kind or nature which Purchaser may sustain or incur in connection with, or arising from, this Agreement, any other present or future agreement, or the breach by Seller of any representation, warranty, covenant or provision contained herein or therein, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered by Purchaser relating in any way to Seller. Notwithstanding any other provision of this Agreement to the contrary, the indemnity agreement set forth in this Section shall survive termination of this Agreement. If Seller fails to honor this Section of the Agreement after termination thereof, Purchaser shall have the right to re-file its UCC-1 financing statement and shall have the right to pursue any and all rights and remedies against Seller as contemplated by this Agreement, any law or in equity. Purchaser may, in its sole discretion, hold or supplement a Reserve to account for any Avoidance Claim.

**9.4     Collection Agencies and Collection Affiliates.** Seller shall forthwith pay to Purchaser or to the Collection Agency the amount of all actual collection agency fees and all other costs incurred by Purchaser under and pursuant to this Agreement, or any other present or future agreement, or in connection with any transaction, or with respect to the Collateral or the defense or enforcement of Purchaser's interests. All collection agencies fees and costs to which Purchaser may be entitled pursuant to this Section shall immediately become part of Seller's Obligations and shall be due on demand.

**9.5     Attorneys' Fees and Costs.** Seller shall forthwith pay to Purchaser the amount of all actual attorneys' fees and all other costs incurred by Purchaser under and pursuant to this Agreement, or any other present or future agreement, or in connection with any transaction, or with respect to the Collateral or the defense or enforcement of Purchaser's interests (whether or not Purchaser files a lawsuit against Seller), including any proceedings in Bankruptcy Court. In the event Purchaser files any lawsuit predicated on a breach of this Agreement or is any way related to this Agreement, the Purchaser shall be entitled to recover its costs and attorneys' fees, including, but not limited to, attorneys' fees and costs incurred. All attorneys' fees and costs to which Purchaser may be entitled pursuant to this Section shall immediately become part of Seller's Obligations and shall be due on demand.

**9.6     Prohibition Against Assignment.** The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of the parties; however, that Seller may not assign or transfer

5

any of its rights under this Agreement without the prior written consent of Purchaser, and any prohibited assignment shall be void. No consent by Purchaser to any assignment shall relieve Seller or any guarantor from its liability for the Obligations. Without limiting the generality of the foregoing, all rights and benefits of Purchaser under this Agreement may be exercised by any institution with which Purchaser maintains any rediscount, factoring or other relationship and by any other person or entity designated by Purchaser.

**9.12** **Amendment.** The terms and provisions of this Agreement may not be waived, altered, modified or amended except in a writing executed by Seller and a duly authorized officer, employee, or agent of Purchaser.

**9.15** **Credit Reports.** Seller authorizes Purchaser to obtain credit reports for Seller and all guarantors at any time, in Purchaser's sole discretion.

**9.16** **Governing Law, Jurisdiction; Venue.** This Agreement and all acts and transactions hereunder and thereunder and all rights and Obligations of Purchaser and Seller shall be governed, construed and interpreted in accordance with the internal laws of the State of Oregon. Seller: (i) agrees that all actions or proceedings relating directly or indirectly hereto shall, at the option of Purchaser, be litigated in courts located within said state, and, that, at the option of Purchaser, the exclusive venue therefore shall be Polk County, State of Oregon; (ii) consents to the jurisdiction and venue of any such court and consents to service of process in any such action or proceeding by personal delivery or any other method permitted by law; and (iii) waives any and all rights Seller may have to object to the jurisdiction of any such court, or to transfer or change the venue of any such action or proceeding.

**9.19** **Waiver of Right to Jury Trial.** PURCHASER AND SELLER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL IN ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN PURCHASER AND SELLER, AND ANY CONDUCT, ACTS OR OMISSIONS OF PURCHASER OR SELLER OR ANY OF THEIR DIRECTORS, MEMBERS, PARTNERS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILIATED WITH PURCHASER OR SELLER. PURCHASER AND SELLER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. PURCHASER AND SELLER FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement through their duly authorized officers or agents.

Dated: 10\30\18 , 2018 **(the "Effective Date")**

**OpenRoad Financial Services, Inc.**
**(Purchaser)**

By:_____ Name:
_____ Its:____

(Seller)
By: Name:
Kristian Emen Its:____
V.P. Cartier Services
Condy t-Press Inc.

### SCHEDULE A TO FACTORING AND SECURITY AGREEMENT

1. **Maximum Factoring Advances Percentage:** 97% of the Purchase Price of each Eligible Account purchased under this Agreement. Purchaser may adjust the Maximum Factoring Advances Percentage upward or downward at any time, in its sole discretion.

2. **Discount Fee:** ▮ for OpenRoad Transportation loads and ▮ for all other customers of the Gross Invoice Amount of each Eligible Account purchased under this Agreement, plus ▮ of the Gross Invoice Amount for every 60 days, plus ▮ of the Gross Invoice Amount for every 90 days that the Account is not paid by the Account Debtor after the date for payment set forth on the invoice for the Account.

3. **Minimum Monthly Discount Fee:** $N/A per month.

4. **Default Factor Advance Fee: (Discount Fee plus N/A% of the Gross Invoice Amount of each Eligible Account purchased under this Agreement.)**

5. **Timing of Rebates from Reserve: N/A.**

6. **Fees and costs:**   ACH Fee: ▮

     Wiring Fee: ▮

     Invoice Preparation Fee: ▮

     New Client Set up Fee: ▮ (one-time fee) WAIVED

     Fuel Advance Fee: ▮

     Reserve: $N/A

7. **Original Term:** N/A .

8. **Trade Names and Styles: County Xpress Inc.**

9. **Address Where Seller Transacts Business and Address for Location of Collateral:**
   _____ .

10. **Application of Payments:** 1 business day(s) after receipt by Purchaser.

11. **Notice to Seller:**

Seller's Initials 

EXHIBIT "A"

# EXHIBIT "B"

1810312310820

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER [optional]

**Trena Harustak**          **(503) 687-2787**

B. E-MAIL CONTACT AT FILER (optional)

**trenah@openrdfs.com**

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Trena Harustak
PO Box 484
Dallas, OR  97338

**Montana Secretary of State**
**File Number: 1810312310820**
**Date Filed: 10/31/2018 10:03 AM**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

Page 1 of 3

1. **DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in the line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1AD)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| County X-Press Inc | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO Box 17741 | Missoula | MT | 59808 | USA |

2. **DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in the line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1AD)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OpenRoad Financial Services, Inc | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO Box 484 | Dallas | OR | 97338 | USA |

4. **COLLATERAL:**   This financing statement covers the following collateral:

```
All present and future assets of the Debtor, wherever located, now owned or existing or hereafter
acquired or created, all additions and accessions thereto, all replacements, insurance or condemnation
proceeds, all documents covering any of the Collateral, all leases of any of the Collateral, all rents,
revenues, issues, profits and proceeds arising from the sale, lease, license, encumbrance, collection,
or any other temporary or permanent disposition of any of the Collateral or any interest therein, all
amendments, modifications, renewals, extensions, and replacements thereof, and all products and proceeds
thereof: (a) all inventory; (b) all accounts (the "Accounts"); (c) all equipment, goods and motor
vehicles (collectively, the "Equipment"); (d) all general intangibles, including any and all patents,
```

5. Check only if applicable and  only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only  if applicable and  only  one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check  only  if applicable and  only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable) ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA

UCC FINANCING STATEMENT (FORM UCC1) (REV. 7/1/2013)

EXHIBIT B
24

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on financing Statement; if line 1b was left blank

because individual Debtor name did not fit, check ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| **County X-Press Inc** | |
| OR 9b. INDIVIDUAL'S SURNAME | |
| | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME -Provide (10a or 10b) only <u>one</u> additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Finanacing Statement (Form UCC1) (use exact; full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | |
|---|---|---|---|---|
| 10a. ORGANIZATION'S NAME | | | | |
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL's FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME    or   ☐ ASSIGNOR SECURED PARTY'S  NAME:   Provide only <u>one</u>  name (11a or 11b)

| | | | |
|---|---|---|---|
| 11a. ORGANIZATION'S NAME | | | |
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

trademarks and copyrights (registered or unregistered), trade secrets, domain names and addresses, and intellectual property licenses; (e) any and all promissory notes and instruments payable to or owing to Client or held by Client; any and all leases under which Client is the lessor; any and all chattel paper in favor of, owing to, or held by Client, including without limitation, any and all conditional sale contracts or other sales agreements, whether Client is the original party or the assignee; and any and all security agreements, collateral and titles to motor vehicles which secure any of the foregoing obligations; (f) all deposits accounts, including without limitation, all interest, dividends or distributions accrued or to accrue thereon, whether or not due; (h) all documents; (i) all letter-of-credit rights; (j) all supporting obligations; and (k) all balances, deposits, debts or any other amounts or obligations of ORFS owing to Client, including, without limitation, any Reserve, whether or not due. Notice - Pursuant to an agreement between Debtor and secured party, Debtor has agreed not to grant a security interest in the collateral, described herein and in any future commercial tort claims to any other secured party.  Accordingly, the acceptance of any such security interest by

| 13 ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing. |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | **16. Description of real estate:** |

17. MISCELLANEOUS:

**UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV 7/1/2013)**

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on financing Statement; if line 1b was left blank

because individual Debtor name did not fit, check ☐

9a. ORGANIZATION'S NAME
**County X-Press Inc**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**10. DEBTOR'S NAME** -Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL's FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

anyone other than the above secured party will constitute the tortious interference with secured party's rights. In the event that any entity is granted a security interest in Debtor's accounts, chattel paper or general intangibles contrary to the above, the secured party asserts a claim to any proceeds thereof received by such entity.

| 13 ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing. |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | **16. Description of real estate:** |

**17. MISCELLANEOUS:**

---

**UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV 7/1/2013)**

# EXHIBIT "C"



# Notice of Assignment

**OPENROAD**
**FINANCIAL SERVICES**

October 30, 2018

PO Box 484
Dallas, Oregon 97338
503-687-2787

**County X-Press Inc** has obtained the services of OpenRoad Financial Services, Inc. as a partner in processing accounts receivable and as an additional source of working capital. This allows **County X-Press Inc** to better service their clientele and continue to grow and to accommodate the changes that growth brings.

This arrangement allows **County X-Press Inc** to focus on delivery of the highest quality products and services during their growth as the company you've grown to depend on.

This arrangement also includes the sale and assignment of all existing and future accounts that are or become due on their accounts to OpenRoad Financial Services, Inc. under the Uniform Commercial Code. Accordingly, you are hereafter directed to make all future payments as follows:

Send Payments by Check:
OpenRoad Financial Services, Inc.
PO Box 484
Dallas, OR 97338

Send Payments Electronically:
Columbia Bank
Routing #: 125108272
Accounting #: 7000759675
Remit ACH Stub: accounting@openrdfs.com

Please make the proper notations on your ledger. This notice and the instructions herein will remain in full force and effect until you are notified to the contrary in writing by OpenRoad Financial Services, Inc. Should you have any questions please call OpenRoad Financial Services, Inc. at 503-687-2787.

Sincerely,

OpenRoad Financial Services, Inc.

**MC #: 566978**
**DOT #: 1513867**

County X-Press Inc

# EXHIBIT "D"

**OpenRoad Financial Services, Inc.**

PO Box 484
Dallas Oregon  97338
503-687-2787
accounting@openrdfs.com

# Invoice

| | |
|---|---|
| Inv # | 5714 |
| Date | 9/3/2019 |
| Load # | Wk8/26-Wk8/30 |

**Bill To**

McKesson Pharmaceutical
1 Post St
San Francisco, CA 94104

**Carrier**

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk8/26-Wk8/3 | 30 days | 10/3/2019 | Please see rate sheet | $29,979.14 |
| | | | **Invoice Total** | $29,979.14 |



Make all checks payable to
**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon  97338
503-687-2787

DO NOT send payment to Carrier!

**OpenRoad Financial Services, Inc.**

PO Box 484
Dallas Oregon  97338
503-687-2787
accounting@openrdfs.com

# Invoice

| | |
|---|---|
| Inv # | 5754 |
| Date | 9/10/2019 |
| Load # | Wk9/3-Wk9/6 |

**Bill To**

McKesson Pharmaceutical
1 Post St
San Francisco, CA 94104

**Carrier**

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk9/3-Wk9/6 | 30 days | 10/10/2019 | Please see rate sheet | $25,243.02 |

| | Invoice Total | $25,243.02 |
|---|---|---|



Make all checks payable to
**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon  97338
503-687-2787

DO NOT send payment to Carrier!

**OpenRoad Financial Services, Inc.**

PO Box 484
Dallas Oregon  97338
503-687-2787
accounting@openrdfs.com

# Invoice

| | |
|---|---|
| Inv # | 5797 |
| Date | 9/17/2019 |
| Load # | Wk9/9-Wk9/13 |

**Bill To**

McKesson Pharmaceutical
1 Post St
San Francisco, CA 94104

**Carrier**

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk9/9-Wk9/13 | 30 days | 10/17/2019 | Please see rate sheet | $30,278.75 |
| | | | **Invoice Total** | $30,278.75 |



Make all checks payable to

**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon  97338
503-687-2787

DO NOT send payment to Carrier!

**OpenRoad Financial Services, Inc.**

PO Box 484
Dallas Oregon  97338
503-687-2787
accounting@openrdfs.com

# Invoice

| | |
|---|---|
| Inv # | 5839 |
| Date | 9/24/2019 |
| Load # | Wk 9/16-9/20 |

## Bill To

McKesson Pharmaceutical
1 Post St
San Francisco, CA 94104

## Carrier

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk 9/16-9/20 | 30 days | 10/24/2019 | Please see rate sheet | $15,009.67 |

| | |
|---|---|
| **Invoice Total** | $15,009.67 |



Make all checks payable to
**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon  97338
503-687-2787

DO NOT send payment to Carrier!

## OpenRoad Financial Services, Inc.

PO Box 484
Dallas Oregon  97338
503-687-2787
accounting@openrdfs.com

# Invoice

| | |
|---|---|
| Inv # | 5840 |
| Date | 9/24/2019 |
| Load # | Wk 9/16/-9/20 |

## Bill To

McKesson Pharmaceutical
1 Post St
San Francisco, CA 94104

## Carrier

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk 9/16/-9/20 | 30 days | 10/24/2019 | Please see rate sheet | $15,149.55 |

| | |
|---|---|
| **Invoice Total** | $15,149.55 |



Make all checks payable to
**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon  97338
503-687-2787

DO NOT send payment to Carrier!

## OpenRoad Financial Services, Inc.

PO Box 484
Dallas Oregon  97338
503-687-2787
accounting@openrdfs.com

# Invoice

| | |
|---|---|
| Inv # | 5879 |
| Date | 10/1/2019 |
| Load # | Wk9/23-Wk9/27 |

## Bill To

McKesson Pharmaceutical
McKesson DC 8180
Salt Lake City, UT 84104

## Carrier

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk9/23-Wk9/2 | 30 days | 10/31/2019 | Please see rate sheet | $37,145.73 |

| | |
|---|---|
| **Invoice Total** | $37,145.73 |



<u>Make all checks payable to</u>
**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon  97338
503-687-2787

DO NOT send payment to Carrier!

**OpenRoad Financial Services, Inc.**

PO Box 484
Dallas Oregon  97338
503-687-2787
accounting@openrdfs.com

**Invoice**

| | |
|---|---|
| Inv # | 5916 |
| Date | 10/8/2019 |
| Load # | Wk9/30-Wk9/4 |

**Bill To**

McKesson Pharmaceutical
1 Post St
San Francisco, CA 94104

**Carrier**

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk9/30-Wk9/4 | 30 days | 11/7/2019 | Please see rate sheet | $37,086.79 |
| | | | **Invoice Total** | $37,086.79 |



Make all checks payable to
**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon  97338
503-687-2787

DO NOT send payment to Carrier!

**OpenRoad Financial Services, Inc.**

PO Box 484
Dallas Oregon 97338
503-687-2787
accounting@openrdfs.com

# Invoice

| | |
|---|---|
| Inv # | 5955 |
| Date | 10/15/2019 |
| Load # | Wk10/7-Wk10/11 |

**Bill To**

McKesson Pharmaceutical
1 Post St
San Francisco, CA 94104

**Carrier**

County X-Press Inc MC# 566978

303-562-4809

| Load Number | Terms | Due Date | Description | Amount |
|---|---|---|---|---|
| Wk10/7-Wk10/ | 30 days | 11/14/2019 | Please see rate sheet | $37,081.93 |
| | | | **Invoice Total** | $37,081.93 |



**OPENROAD**
FINANCIAL SERVICES

<u>Make all checks payable to</u>
**OpenRoad Financial Services, Inc.**
PO Box 484
Dallas Oregon 97338
503-687-2787

DO NOT send payment to Carrier!